# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No._____


**JOANN AMOROSO,** an individual,

      Plaintiff,

v.


**EMS SOFTWARE, LLC,** a Delaware Limited Liability Company
**ROBERT GAFFNEY,** individually and official capacity,
**JACOB MCNULTY** individually and official capacity, and
**CINDY MACDONALD,** individually and official capacity,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Joann Amoroso ("Plaintiff") through her undersigned counsel submits this Complaint and Jury Demand against Defendants EMS Software, LLC, ("EMS") Robert Gaffney, Jacob McNulty and Cindy MacDonald (hereinafter collectively "Defendants").

## I.   NATURE OF THE ACTION

1.     This is an action for relief from violation of the Equal Pay Act of 1963 29 U.S.C. Sections 206(d)(1) and 29 U.S.C. § 215(a)(3); and Colorado Equal Pay Law (C.R.S. 8-5-102.).

2.     Plaintiff is a female and claims she was paid less than male employee counterparts who work at the same establishment performing substantially equal work under substantially equal conditions.

3.     Plaintiff seeks compensatory damages, punitive damages, liquidated damages, and reasonable attorneys' fees and costs as remedies for Defendants' violations of Plaintiff's rights.

## II.    THE PARTIES

4.    Plaintiff is a female residing in Centennial, Colorado.

5.    Defendant EMS Software, LLC ("EMS" or "Company") is a Delaware limited liability company doing business in Colorado with a registered business address of 6465 Greenwood Plaza Blvd. Suite 600 Centennial, CO 80111 ("Headquarters") and does business in Colorado as well as internationally.

6.    Plaintiff was originally hired by Dean Evans and Associates, Inc. ("DEA") on or about February 2, 2011 as a Customer Care Manager earning $60,060 (Annually).  During all times relevant, Plaintiff worked out of EMS Headquarters.

7.    Upon information and belief, Defendant EMS is the successor employer and/or successors-in-interest to DEA and its subsidiaries.

8.    Defendant Jacob McNulty ("McNulty") is a Colorado resident who lives at 215 West Second Avenue in Denver, CO 80223. As the Vice President Customer Experience (now called Customer Success) during times relevant, McNulty worked out of EMS Headquarters and, had direct supervisory authority over Plaintiff and participated in determination of Plaintiff's terms and conditions of employment including compensation.

9.    Defendant Robert Gaffney ("Gaffney") is a Colorado resident who lives at 479 Silbrico Way in Castle Rock, CO 80108.   As the Chief Financial Officer for EMS during times relevant, Gaffney worked out of EMS Headquarters and participated in determination of Plaintiff's terms and conditions of employment including compensation.

10.    Defendant Cindy MacDonald ("MacDonald") is a Colorado resident who lives at 16589 Amberstone Way in Parker, CO 80134.   As the Vice President, Human Resources for EMS during times relevant, MacDonald worked in EMS Headquarters and participated in determination of

2

Plaintiff's terms and conditions of employment including compensation.

## III.   JURISDICTION AND VENUE

11.   This Court has jurisdiction of Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331, as this case involves questions of federal law.

12.   On information and belief, Defendant EMS, is an international software company with headquarters located in Centennial, Colorado employing approximately 120 individuals.

13.   All or most of the events alleged occurred while Plaintiff was employed by Defendant in its Centennial, Colorado Headquarters.

14.   During times relevant to this Complaint, Defendant engaged in interstate commerce.

15.   This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution.

16.   Plaintiff's state law claims share all common operative facts with their federal law claims, and the parties are identical.

17.   Resolving Plaintiff's federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

18.   Venue is proper in, and Defendants are subject to the personal jurisdiction of this Court because Defendants maintain residency, facilities, and/or business operations in this District and all or most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

## IV.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

19.   Plaintiff timely filed an action on June 23, 2017 [EEOC Charge No.: 541-2017-01627 ("Charge") with the Equal Employment Opportunity Commission ("EEOC" or "Agency") in which

Plaintiff alleged discrimination on the basis of sex (female/harassment/hostile work environment), age (over 40), retaliation (engagement in protected activity), and violation of the Equal Pay Act of 1963, as amended, Title VII of the Civil Rights Act of 1964, as amended, and the Age Discrimination in Employment Act of 1967, as amended against Defendant EMS.

20.     Plaintiff's Charge is pending before the Agency and Plaintiff reserves the right to amend her pleadings upon completion of the Agency's review.

## V.     FACTUAL ALLEGATIONS

19.     At all times relevant, Plaintiff was employed by Defendant EMS in Defendant's Centennial, Colorado Headquarters office.

20.     On information and belief, DEA accepted a strategic growth investment in April of 2014 from JMI Equity ("JMI") that eventually led to a name change of from DEA to EMS Software.

21.     Plaintiff began employment with DEA as a Customer Care Manager on or about February 2, 2011 earning $60,060 on an annual basis. As a Customer Care Manager, she was responsible for responding to customer questions and resolving customer identified technical issues through management of a team of six direct reports. At that time, Plaintiff reported directly to Scott Anderson ("Anderson"), the Director of Client Services, who in turn reported to the President/Owner of the Company, Dean Evans ("Evans").

22.      Over the course of a three-year period (2012, 2013, and 2014), Plaintiff received annual performance reviews that recognized her as a top-level performer.

23.     The year-over-year salary treatment accorded Plaintiff appears consistent with this performance assessment given the nearly 20% increase in base salary (i.e., $60,060 to $72,000) that resulted over the same three-year period.

24.     The bonus-based compensation accorded Plaintiff from 2012 through 2014 similarly

suggests at least satisfactory performance as it aligned with Company targets.

25.     As the need for technical expertise and customer support increased, so too did Plaintiff's responsibilities. Her support team of direct reports had grown to approximately seventeen (17) members by early 2014.

26.      With the increased importance of customer and support services, the leader of Client Services, Anderson, was elevated to the position of Vice President within the Company.

27.     Plaintiff was named a member of the Leadership Team effective May 1, 2014 and received a salary increase to $77,500 (annualized) as well as awarded a $10,000 Retention Bonus while being named a Vice President, Customer Support effective May 1, 2014.

28.     Plaintiff had the largest direct report team size (approximately seventeen employees) of any of the Leadership or the Executive Team Vice Presidents at the time of her promotion.

29.     Plaintiff proposed the support department be restructured to include two span-breaker supervisors who would report directly to her with each in turn supervising their own teams.  The proposed structure was in response to the changed and added responsibilities of the Plaintiff's new Vice President role, promote efficiencies and to move day to day Customer Care Manager responsibilities to an appropriate hierarchical level.  Her business plan was approved, and Plaintiff secured promotions for two team members who began leading designated sub teams.

30.     On information and belief, male Vice Presidents on the Leadership Team during times relevant include Michael Wimett ("Wimett"), Akshay Mahajan ("Mahajan"), Assad Jarrahian ("Jarrahian") and Dan King ("King").

31.     On information and belief, Wimett, Mahajan, Jarrahian, and King worked at the same establishment as Plaintiff during times relevant to this complaint.

32.     On information and belief, Wimett, Mahajan, Jarrahian, and King worked under

substantially equal conditions as Plaintiff during times relevant to this complaint.

33.     On information and belief, Wimett, Mahajan, Jarrahian, and King, performed substantially equal work as plaintiff including for example: reported directly to an Executive Team Member; were responsible for managing a distinct department for Defendant EMS which included managing to a dictated budget and staffing limitation; drafting defending, monitoring, and finalizing department Vision, Strategies and "Major Initiatives" that aligned to and supported EMS key business objectives; presenting to the JMI Board at monthly Operations Meetings; identifying, compiling, analyzing and responding to KPI departmental metrics; attending weekly product team meetings with EVPs and the Chief Executive Officer; managing department day-to-day operations; serving as the department final escalation point; drafting interdepartmental processes; attending annual JMI Executive Operations Excellence Roundtables attended by all portfolio companies; managing and coordinating hiring for the department within budgetary dictates; collaborating with fellow vice presidents to rate and rank Company employees.

34.     On information and belief, the difference in pay between Plaintiff and identified or potential other comparators does not relate to a seniority and/or merit system that measures earnings by quantitative quality or product or based on any factor other than sex.

35.     In September of 2014, Bob Irwin ("Irwin)" was named the new Chief Executive Officer, and with his selection, Plaintiff was realigned to report to the former owner, Evans, who remained with the Company as the Leader of Product.

36.     In early January 2015, Irwin requested an in-person meeting with Plaintiff. At that meeting, on or about January 20, 2015, Irwin informed Plaintiff the Company discovered inequities in its compensation structure that required redress.

37.     Irwin explained Plaintiff had not been paid in alignment with others performing

similar duties under similar circumstances and that the inequities required redress.  He further

explained the Company was not positioned to correct the disparities in one fell swoop.  Accordingly,

he stated, the Plaintiff's pay disparity would be corrected under a three-year plan he had devised

("Plan").

38.     Plaintiff asked Irwin if JMI was aware of the inequities and, if so, if JMI was aware

of the Plan. Irwin assured Plaintiff JMI was aware of the Plan.

39.     In February of 2015, Plaintiff's annualized base salary was increased to $85,000, and

her bonus opportunity was increased to 10%. At this time Plaintiff's bonus payment was also

changed so that it would be calculated under the "Leadership Bonus Plan" which meant it would be

received annually not quarterly pursuant to the staff bonus program.

40.     Upon learning of this compensation treatment, Plaintiff met with Cindy MacDonald,

female, Vice President of Human Resources ("MacDonald") to confirm this new treatment was part

of the Plan Irwin had discussed with her.  MacDonald confirmed the treatment was issued in

conjunction with the Plan and told Plaintiff she would be "extremely pleased and surprised" with her

target compensation under the three-year Plan.

41.     MacDonald also informed Plaintiff Mindy Bainbridge, female, (Vice President,

Professional Services) and MacDonald herself were the other Plan subjects.

42.     Rebecca VanHousen, who was the CFO at the time, confirmed to the Plaintiff that

there was a salary disparity as Irwin had described and that it was based on gender discrimination.

43.     In late February of 2015, the Company hired PG Bartlett ("Bartlett") as Executive

Vice President of Product.  In this role, Bartlett was responsible for Product Management,

Development, and Customer Support.

44.     Although Plaintiff had been reporting to Evans, Plaintiff began reporting to Bartlett

upon his hire and remained a Leadership Team member as Vice President of Customer Support.

45.     On or about September 14, 2015, Plaintiff learned her position would again be re-aligned when she was told she would report to the recently on-boarded Jacob McNulty ("McNulty"), whom the Company announced as its new Executive Vice President of Customer Experience.

46.     Though with the Company for only a matter of weeks, McNulty, without consulting Plaintiff, dictated the immediate reduction in the staff of four (4) Customer Support employees, 25% of the Customer Support team.

47.     Though Plaintiff attempted to discuss with McNulty a number of operational concerns she had with implementation of such a dramatic reduction in staff, she and her concerns were ignored.

48.     McNulty then instructed Plaintiff to restructure the team so that all team members would become direct reports to Plaintiff. McNulty's directive required Plaintiff to dismantle the structure she put into place a year and a half prior (approximately April of 2014) that allowed the team to more effectively supervise the team and manage fluctuating demand.

49.     Though Plaintiff attempted to explain to McNulty how the structure helped the team function more efficiently, he demanded the directive be implemented. Accordingly, Plaintiff laid off four support Tier 1's and demoted the two team  managers she previously promoted and returned both to full-time Tier 3 team members' status.

50.     With the structural change ordered, Plaintiff was forced to assume management responsibility over 14 direct reports.

51.     In the November/December 2015 timeframe, McNulty also demanded Plaintiff implement a software change – Zendesk - to the ticketing system used to track and manage customer issues.  He informed Plaintiff he had already pitched the new system, which he selected in a

vacuum, to the Board. McNulty told Plaintiff he promised the Board to have the new ticketing

system up and running by the end of January 2016.

52.     McNulty knew implementation of the change would require Plaintiff to lead the

design and implementation effort (with another already overworked team member). Yet, he gave no

consideration to Plaintiff's feedback that included realities associated with designing and

implementing such changes.

53.     Stupefied by McNulty's lack of business acumen, concern, collaboration, and

leadership, Plaintiff once again warned McNulty of the obvious -- that a change in the ticketing

system in the midst of the mountain of customer issues already confronting the team could prove

disastrous.  Plaintiff's words fell on deaf ears.

54.     In December of 2015, Plaintiff asked McNulty about the status of the Plan wanting to

know when the next phase of salary adjustments would be implemented since McNulty was new,

she explained the reason for the Plan and her concern she had not heard anything further about the

Plan or the effort to correct the known salary inequities.

55.     After explaining the history behind the Plan, Plaintiff observed McNulty enter a note

into his phone.  McNulty then told Plaintiff he would follow-up with Irwin and provide status at a

later date.

56.     More than two months passed without any follow-up from McNulty.

57.     In February of 2016 Plaintiff approached McNulty for the purpose of reminding him

of her inquiry and interest in securing an update and status on the Plan's corrective actions.

58.     McNulty neither offered an apology for having failed to follow-up as promised, nor

offered an update on the status of Plan implementation, despite having had months to secure one.

Instead, McNulty only said he would get back to Plaintiff.

59.     In mid-March 2016, Irwin exited the Company and the Chief Financial Officer, Robert Gaffney ("Gaffney"), was named Acting Chief Executive Officer and the designated leader of the Executive Team.

60.     When Irwin exited, Plaintiff, along with other Departmental Vice Presidents and Company Executives, was asked to sit for a photo shoot.  The resulting photos were ultimately posted on the Company website where the EMS Executive and Leadership Team members are profiled.

61.     On or about April 8, 2016, McNulty sent an email to Plaintiff in which he outlined concerns with her performance. At a high level, he stated concerns related to his perceived deficiencies with Plaintiff's "VP" strategic skills, leadership, and ability to execute.  The email went on to detail concerns with the department not using software solutions, like Zendesk, he maintained were better suited to managing customer service workflows.  McNulty also criticized Plaintiff for having pushed various processes forward he believed ineffective.

62.     On or about April 8, 2016 McNulty verbally informed Plaintiff the Company abandoned the Company's Plan.  McNulty then stated no further action would be taken to correct the identified compensation disparities.

63.     On or about April 12, 2016, Plaintiff learned she would receive a one percent (1%) raise based on her 2015 performance when McNulty emailed a spreadsheet that listed performance-related compensation treatment for her team and herself.  Ostensibly McNulty relied on the concerns he outlined in his April 8, 2016 email to substantiate the one percent (1%) raise allocated to Plaintiff.

64.     The relevant reporting period, however, was for 2015 -- a period during which McNulty had limited exposure to Plaintiff, and the team.

65.     When Plaintiff asked McNulty in an email dated April 13, 2016 to explain the basis

for the one percent (1%) salary treatment and to reconsider the rating, he provided no substantive response.

66.     On or about April 14, 2016, McNulty sent Plaintiff a spreadsheet through which Plaintiff was informed she would receive a three percent (3%) raise.

67.     On or about April 14, 2016, Plaintiff visited with MacDonald who confirmed Plaintiff would, in fact, receive a three percent (3%) raise, not the one percent (1%) increase McNulty previously communicated.

68.      It was also at this time MacDonald confirmed with Plaintiff the Company would no longer be taking any further action toward addressing the known salary inequities that the two previously discussed and that was promised.

69.     Although the Company reversed its decision to issue a paltry one percent (1%) salary increase to Plaintiff, the reason for the decision to issue it in the first instance was never provided.

70.     The basis for issuing a three percent (3%) increase was similarly not communicated.

71.      Although Plaintiff specifically asked McNulty to explain how the annualized Executive bonus and the first quarter "staff plan"bonus she had received were apportioned between 2015 and first quarter 2016, he did not do so.

72.     Plaintiff asked MacDonald if she could explain the bonus treatment and her going forward compensation.  McDonald informed Plaintiff her bonus opportunity would be grandfathered at 10% but stated Plaintiff would no longer be paid on an annual basis (per the *Executive* Compensation Program) but on a quarterly basis (under the *Staff* Compensation Program).  The annual and quarterly bonuses were paid prior to notifying Plaintiff of her removal from the Executive Compensation Plan.

73.     Plaintiff was also told by MacDonald that McNulty zeroed her out for the second

quarter 2016 bonus treatment, without explanation.

74.     Not to be deterred in her effort to ensure the support team would be appropriately staffed, Plaintiff, well versed in industry standard staffing forecasting, provided McNulty with data in an April 26, 2016 email that supported her contention his decision to split the team, rather than optimize economies of scale, was adversely impacting performance (i.e., call answer rate).

75.     In this regard, Plaintiff used data to illustrate for McNulty the abandon call rate was increasing month-over-month following the reduction in staff, the splitting of the team, the January 2016 product release that included an inordinate number of bugs, and the acquisition of a poor-quality software product.

76.     Despite her continued transparent communication on these and other issues, McNulty took no action.  As a result, the customer support department's service quality standards which had previously earned recognition, under Plaintiff's leadership as "superior" continued to fall to new lows.

77.     On April 28, 2016, Vincent Prajka of JMI ("Prajka") contacted Plaintiff in an email to request they discuss the reported Customer Support service metrics.  In particular, Prajka suggested the need for more insight surrounding wait times (hold times), call volume (incoming traffic) and resolution time (time to resolve issues).

78.     Prior to McNulty's arrival to the Company, Plaintiff typically would prepare a comprehensive report for Bartlett who in turn reported relevant data to the Board. However, after McNulty assumed leadership oversight of the team, reporting of such data ceased, though Plaintiff continued to report all metrics (including problematic data evidencing poor customer service trends) to McNulty.

79.     When McNulty, learned of Prajka's efforts to confer directly with Plaintiff, he

expressly prohibited Plaintiff from meeting with Prajka on her own. Until Prajka contacted Plaintiff, she had no idea the data presented the Board was selectively edited.

80.     Because of McNulty's prohibition, the meeting with Prajka was delayed until early May 2016 to allow McNulty to participate.

81.     Once held, Plaintiff presented data and backup information substantiating the declining service metrics.  Just as Plaintiff explained to McNulty in their meeting on or about April 27, 2016, Plaintiff explained the loss of 25% of the Customer Support  team as a result of a reduction in force implemented in November 2015 had a significant impact on team performance. Plaintiff reminded the two of the fact that December is historically the slowest month for Customer Support.For that reason, Plaintiff knew the negative metrics would not begin to manifest until early in the first quarter, which is exactly what happened. Plaintiff also explained the demands placed on the team as a result of the low-quality product that was being supported due to an acquisition and the unusually problematic EMS product update release in January of 2016 played a significant role in adversely affecting performance.

82.     Though not discussed in the meeting with Prajka, the data evidences it took only six months under McNulty's so-called leadership for the Customer Support team to go from superior ratings to experiencing a nearly 1000 percent increase in customer issues.  Put another way, a 1000 percent decrease in satisfaction.

83.     The significant increase in demand for customer support required Plaintiff to personally tend to customer issues alongside the rest of the overworked and overrun team.

84.     As Plaintiff increasingly became consumed by day-to-day customer issues, her ability to maintain effective management oversight was increasingly challenged. Despite this reality, Plaintiff kept McNulty apprised of the Customer Support data trending metrics and even offered

various strategies for combating the increasingly troubling numbers. Assuming McNulty reviewed the data provided by Plaintiff, he could not have helped but recognize the dire situation unfolding; yet no direction was given.

85.    Whether in response to the April 27, 2016 staffing needs email Plaintiff sent to McNulty or as a result of the meeting with Prajka, or more probably both, Plaintiff finally received approval to hire two Tier 1 level positions (the same position McNulty previously instructed her to eliminate during the previous November layoff in early May 2016).

86.    Plaintiff also received approval from McNulty to reinstate the two Support Department span breaker supervisory positions that were also eliminated concurrent with the November 13th layoff.

87.    Though thankful and relieved, Plaintiff again warned McNulty it would take approximately two (2) to three (3) months to complete the hires, as the Tier 1 position is a highly competitive title in the Denver market.

88.    In May 2016, Plaintiff successfully completed design and implementation of Zendesk, and the Customer Support team went live with the new ticketing software.

89.    On June 8, 2016, McNulty, told Plaintiff to abandon Zendesk for the support ticketing system and move the team to Salesforce.

90.    As Plaintiff predicted, it took approximately two (2) months to post and place the Tier 1 positions.  Accordingly, it was July of 2016 before the Customer Support team was up and running with a staff and structure needed to meet customer demand.

91.    During the selection process for the two supervisory positions, Plaintiff submitted proposed salary ranges to McNulty for approval. The proposal included starting one of the newly promoted managers at a base annualized salary of $83,000.

92.     McNulty objected, stating that the base compensation was *too low* in light of what the role required.

93.     Plaintiff informed McNulty if she were to accord any more compensation, her staff would make more than she did; McNulty walked away without further comment.

94.     The salaries were approved, as originally requested by Plaintiff.

95.     On July 22, 2016, Plaintiff received a written, formal performance improvement plan "PIP" from McNulty. Per the terms of the PIP, Plaintiff had two weeks to evidence improvement and ostensibly avert termination.  Having received PIP, Plaintiff once again sought time with MacDonald, whom Plaintiff learned knew nothing about the PIP.

96.     In meeting with MacDonald, Plaintiff began to view the situation as increasingly untenable, believing McNulty was trying to force her out.  With that in mind, Plaintiff suggested to MacDonald they begin discussing an exit strategy.  In response, MacDonald suggested Plaintiff use the weekend to think about things but promised to raise the idea of an exit strategy with Gaffney.

97.     Though Plaintiff agreed to use the weekend to reflect, she reminded MacDonald she had to ask McNulty no less than twice about the status of her salary treatment only to ultimately be told by McNulty and MacDonald the Plan was abandoned.

98.     Further, no matter her efforts to openly and transparently communicate operational/staffing concerns to her leadership, those concerns were largely ignored until recently.

99.     When Plaintiff was told she would only receive a one percent (1%) increase in her base pay – suggesting poor performance -- substantive feedback to support treatment was not offered.  Though Plaintiff agreed to think about whether an exit strategy was needed, she insisted any separation arrangement be constructed with due consideration of the pay inequities suffered and for which she should be made whole.

15

100.    As promised, MacDonald discussed structuring of a potential separation agreement with Gaffney and the Company's legal counsel.  However, MacDonald reported any such agreement would be limited to between three (3) and six (6) months of Plaintiff's then in effect base salary.

101.    Further, MacDonald said because Plaintiff articulated continuing concerns about salary inequities, EMS counsel required MacDonald to trigger an investigation of the concern. Since MacDonald was also to have received treatment under the Plan, MacDonald was forced to recuse herself from further involvement.

102.    On or about July 25, 2016 McNulty, MacDonald, and Plaintiff met to discuss the PIP issued three days prior.  During the discussion, McNulty admitted having downloaded the PIP form from the internet and acknowledged neglecting to involve Human Resources.  McNulty also admitted the language used in the PIP, including specifically references to "gross misconduct" was included because "it was in the form" and not because he meant to include it.

103.    During the meeting, Plaintiff specifically asked McNulty if he had an issue with her work attendance, since the PIP referred to her having used a single sick day.  McNulty replied he had no issue with her attendance, leaving Plaintiff to question why the reference was included in the first instance.

104.    At the close of the meeting, MacDonald, McNulty, and Plaintiff agreed to hold update meetings throughout the two-week assessment period provided under the PIP. During the discussion, Plaintiff also specifically requested McNulty confirm (or deny) items and priorities in the work stream and specifics be provided on what constituted progress under the PIP. With MacDonald present, Plaintiff highlighted that although she previously provided vision and strategy plans to McNulty, she never received feedback from him.  In this way, Plaintiff emphasized the significance of receiving feedback on key objectives to be achieved, real time. Though non-

16

responsive to her point, McNulty told Plaintiff all discussions regarding the PIP were confidential and instructed her to refrain from discussing it with anyone.

105.     On or about July 27, 29, and August 3, 2016 Plaintiff met, as agreed, with McNulty. In these meetings the two-discussed progress made per the PIP.  McNulty required the two use "Smart Sheet" -- a software project management program McNulty held ownership of which no other EMS department had used or trained on.  Because Plaintiff did not have control over the program (McNulty did), she had limited access, making her ability to provide comprehensive status updates challenging. In these meetings, McNulty and Plaintiff discussed the major work streams and activity timelines for each.  And, although Plaintiff sought confirmation from McNulty as to specifics on what needed to be addressed, McNulty offered little in the way of feedback, good or bad. Plaintiff, as a result, was largely left to guess what McNulty was concerned about.  And, at the close of the August 3rd meeting, McNulty simply said: "Excellent." Plaintiff took the comment to mean she successfully performed in accordance with the terms of the PIP.

106.     On or about July 29, 2016, Plaintiff learned the Company retained an outside investigator to investigate her concern of gender-based discrimination and retaliation.

107.     On or about August 5, 2016, Plaintiff was invited to attend a meeting with McNulty and Gaffney. In the meeting, Plaintiff was informed for the first time that she failed to meet the requirements of the PIP.  McNulty then began reading what appeared to Plaintiff to be excerpts from the written PIP assessment he drafted.  It seemed to Plaintiff McNulty focused concerns around the support cloud strategy.

108.     Plaintiff was provided a limited opportunity to counter McNulty's accusations and when she asked what the consequences of PIP failure were, the meeting was abruptly adjourned without any indication as to when or what the follow-up would be.

109.    Plaintiff implored McNulty and Gaffney, asking if she was going to be told the consequences of failing the PIP to which McNulty responded she was not going to be told.

110.    On or about August 8, 2016, Plaintiff met with the outside "investigator."

111.    On or about August 11, 2016, Plaintiff was asked to attend a meeting with Gaffney. During the meeting, Plaintiff was told she was a "valuable member" of the EMS team and that Gaffney wanted to end the *"histrionics"* of the last meeting with McNulty (i.e., the PIP meeting).

112.    Gaffney elaborated by explaining he had an open position he believed suitable for Plaintiff.  He then asked Plaintiff if she was interested in staying with the Company and Plaintiff said she was amenable to opportunities, but required specifics about the job, including duties, compensation, etc., in order to respond.

113.    Gaffney lacked details, but offered the position was one he had planned to staff at a later date but was willing to staff it sooner in conjunction with the situation at hand.

114.    Gaffney then promised to provide additional information to Plaintiff at a later date, but insisted she confirm her interest, which she did.

115.    On or about August 19, 2016, Gaffney sent Plaintiff an email that included a job description for a Cloud Operations Service Lead.  Interestingly, the Cloud Operations Service Lead position, which was a two-level demotion for Plaintiff, effectively removing her from Leadership provided for a salary that matched the salary Plaintiff earned as the VP, Customer Support.

116.    On or about August 22, 2016, Plaintiff responded to Gaffney in an email in which she requested a meeting to discuss the Cloud Operations Service Lead position in more detail, the compensation structure, and the PIP findings.  Plaintiff explained such a meeting seemed necessary if she were to make an informed decision about the opportunity presented and its short and long-term implications for her career.  Plaintiff also stated she would like her counsel to attend the

meeting.

117.    On or about August 25, 2016, Gaffney responded to Plaintiff in an email stating he would not participate in any meeting involving her counsel.

118.    On or about August 28, 2016, Plaintiff wrote Gaffney to explain her rationale for wanting her counsel present. Gaffney continued to objection to a meeting.

119.    On or about August 29, 2016, Plaintiff sent another email to Gaffney and outlined questions she had regarding the Cloud Operations Service Lead position.

120.    On or about August 30, 2016, Gaffney responded to Plaintiff by articulating a deadline of September 1, 2016 to accept or reject the position but made clear the Vice President Customer Support position she currently held was no longer available to her.  Plaintiff therefore understood if she were to reject the offer, her employment would be terminated even though neither Gaffney nor McNulty ever told her the outcome of her "failure" to meet the terms of the PIP.

121.    On or about September 1, 2016, knowing she had no choice, Plaintiff formally accepted the two-level demotion position. Later that afternoon, Greg Biegen, Director of Cloud Operations, announced Plaintiff joined his team as a "Service Delivery Lead", a two-level demotion.

122.    McNulty then sent a Company-wide email in which he announced he would assume the duties formerly performed by Plaintiff, until a replacement could be located.  Plaintiff was eventually replaced, by a male.

123.    On or about September 8, 2016, at Bartlett's request, he and Plaintiff met for lunch. During the lunch, Bartlett told Plaintiff Irwin had done her no favors moving her under McNulty. He explained the Executive Team had not had any concerns with Customer Support when he had executive leadership responsibilities over the team.  He said he was unaware of what was happening until the announcements were made the week prior.  Bartlett also expressed concern Plaintiff would

find the new position boring since it was far beneath her abilities.

124.    From September 12-14, 2016, Plaintiff attended the EMS User Conference held in Phoenix, Arizona. At the conference, Plaintiff ran the support lab, as she had done every year since her hire.

125.    Upon her return to the office, she discovered her desk was relocated, allegedly as a part of a larger office rearrangement, to a desk in the development area, against a wall, facing another wall.  Bartlett approached her to question how she ended up with the "worst desk in the office" and indicated he would make other arrangements as soon as headcount for the coming year was finalized.

126.    On or about September 26, 2016, Arminder Singh ("Singh"), a male, was announced as the newly hired Senior Director of Support, which was the replacement position for the Plaintiff's VP role.  The job was not publicly posted and apparently not subject to competition. Singh, Plaintiff learned, was a former colleague of Akshay Mahajan (VP, Product) and is also an acquaintance of McNulty.

127.    Even after being confronted with job loss and forced to take a position two levels below her previous position, McNulty and Singh, (who is responsible for the support department management, the monthly metrics reports and reports directly to McNulty) continued to engage in retaliatory action against Plaintiff.

128.     This retaliatory action occurred on or about November 29, 2016 when Singh approached Plaintiff to inform her the data she reported to McNulty for use in the monthly Operations Meeting with JMI was flawed.  Surprised by this assertion, Plaintiff returned to the source data and on or about November 30, 2016 sent a spreadsheet to Singh and McNulty proving the accuracy of the data she reported to a 99.99% certainty.

129.     The next day, Plaintiff learned her access to the source data was removed, thus denying her the ability to continue to disprove the conclusory statements being made by leadership since being removed and demoted.

130.     On June 22, 2017, Plaintiff was informed her position was eliminated due to a "restructuring" and she was discharged.

131.     Since approximately the first quarter of 2016, Plaintiff has suffered emotional distress resulting from continuously asking her supervisor McNulty about the status of the corrective measures related to her compensation and the negative actions that followed.

132.     The emotional distress led to physical manifestations of sleeplessness, fatigue, anxiety, loss of self-esteem, humiliation and depression given the increased adverse actions that she was forced to suffer and the eventual consequences that befell her family as a result. Colleagues in the office even commented she no longer "seemed like herself".

133.     Defendants' actions, individually and collectively, of ignoring Plaintiff's requests to status her on Plan implementation, penalizing her performance ratings, compensation treatment, demoting her, demoralizing her by putting her in a corner, providing her with a work station facing a wall, telling her that her work was deficient when it was not, removing her access to systems so she could not prove her work was accurate, placing her on performance improvement plans but refusing to inform her on what needed specifically to be "improved",  terminating and/or allowing her position to be "restructured" (along with having three Leadership team members in the termination meeting including the Gaffney, which was an atypical procedure) were actions taken in retaliation for requesting her compensation be corrected to remedy pay disparities.

134.     Defendants actions were retaliatory and caused Plaintiff financial, emotional, mental, and physical harm and distress.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

Sex-Based Pay Discrimination in Violation of
Equal Pay Act, 29 U.S.C. § 206(d)(1)
as against all Defendants

135.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 1 through 134, above.

136.    Section 206(d)(1) of the Equal Pay Act makes it unlawful for an employer "to discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, efforts, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system, (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex."

137.    Upon information and belief, Defendants Gaffney, McNulty, and MacDonald had authority to determine Plaintiff's pay and working conditions at EMS and dictated her terms of employment.

138.    Defendants have employed Plaintiff and male employees in jobs as Vice President, Product Management; Vice President, Finance, and Vice President, Product Development, requiring substantially equal skill, effort and responsibility.

139.    Plaintiff and male employees performed their jobs under similar working conditions.

140.    Plaintiff was paid a lower wage than the male employees doing substantially equal work.

141.    The differential in pay between male and Plaintiff was not due to a bona fide seniority system, a bona fide merit system, or a bona fide system that measures employee earnings by quantity or quality of work, nor was the difference in pay a result of a factor other than sex.

142.    Defendants caused, contributed to, or caused the continuation of wage rate discrimination based on sex, in violation of the Equal Pay Act.

143.    As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic damages to be proven at trial.

144.    As a result of Defendants' actions, Plaintiff has suffered emotional distress, resulting in an amount to be proven at trial.

145.    Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for equal pay violations at trial, including liquidated damages for all willful violations, prejudgment interest, attorneys' fees and costs, and other compensation pursuant to 29 U.S.C. §216(b).

## SECOND CLAIM FOR RELIEF

Sex-Based Discrimination in Wages in Violation of
Colorado Wage Equality Regardless of Sex and Wage Discrimination Act
C.R.S. § 8-5-102

146.    Plaintiff incorporates by reference as if fully set forth herein allegations contained in paragraphs 1 through 145 above.

147.    Colorado Equal Pay Act was enacted to ensure "No employer shall make any discrimination in the amount or rate of wages or salary paid or to be paid his employees in any employment in this state solely on account of sex thereof."

148.    Defendants employed Plaintiffs and male employees in jobs as requiring substantially equal skill, effort, and responsibility.

149.    Plaintiff and male employees performed their jobs under similar working conditions.

150.    Plaintiff was paid a lower wage than the male employees doing substantially equal work.

151.    The differential in pay between male and female employees was not based on a reasonable factor or factors other than gender.

152.    Defendants caused, contributed to, or caused the continuation of wage discrimination based on sex, in violation of Colorado state law.

153.    As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic damages to be proven at trial. As a result of Defendants' actions, Plaintiff has suffered emotional distress, resulting in damages in an amount to be proven at trial. Plaintiff further seeks punitive damages and all other injunctive, declaratory, and monetary relief available for equal pay violations at trial, including liquidated damages, prejudgment interest, attorneys' fees and costs, and other compensation pursuant to C.R.S. § 8-5-102

**THIRD CLAIM FOR RELIEF**
Reprisal in Violation of the
FLSA/Equal Pay Act
29. U.S.C. § 215(a)(3).

154.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 1 through 153 above.

155.    The Equal Pay Act, as incorporated into the FLSA, provides it is unlawful "to discharge or in any other manner discriminate against an employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter," 29. U.S.C. § 215(a)(3).

156.    Plaintiff made informal and formal complaints to Defendants' agents and employees opposing Defendants' unlawful, discriminatory employment practices based on national origin and

sex.

157.    Plaintiff complained about her salary and sought corrective action to be applied for herself and for others regarding the same. Plaintiff's concerns and complaints were made reasonably and in good faith. In so doing, Plaintiff suffered material adverse action, which may have dissuaded a reasonable employee from making or supporting a charge of discrimination.

158.    Here, as alleged inter alia, Plaintiff engaged in a protected activity when she informed McNulty of the Plan that had been adopted by the Company prior to his retention to correct the disparate treatment in compensation as acknowledged in early 2015 by the then CEO, CFO and the current VP of HR.

159.    Plaintiff suffered retaliation after she questioned the status of the corrective action she knew was needed to address pay disparities based on gender.

160.    Plaintiff's effort to require the Company to comply with its obligation to correct the unlawful disparity in pay suffered by herself in others resulted in Defendant's agent, McNulty, placing Plaintiff on an informal PIP articulating perceived "deficiencies" in Plaintiff's performance as a Vice President when he lacked sufficient exposure to warrant the ability to rate, let alone issue a negative rating.

161.    Plaintiff suffered retaliation when Defendant's agent, McNulty, issued a 1% salary treatment without explanation, despite being repeatedly asked to do so.

162.    Plaintiff suffered retaliation when Defendant's agent, McNulty, zeroed out her second quarter 2016 bonus treatment.

163.    Plaintiff suffered retaliation when Defendant's agent, McNulty, issued Plaintiff the formal PIP.

164.    Plaintiff suffered retaliation when she confronted MacDonald, in her office, about the

formal PIP and a potential exit strategy reminding her of the need to correct the pay differential and implement the Plan the two had previously discussed and confirmed, but MacDonald refused to support Plaintiff or the Plan instead enforcing the formal PIP and eventually, the two-level demotion and ultimately the termination action.

165.    Plaintiff suffered retaliation when Defendant informed her she failed to meet the requirements of the formal PIP.

166.    Plaintiff suffered retaliation when Defendant discharged her from her Vice President, Customer Support position on September 1, 2016.

167.    Plaintiff suffered retaliation when she was forced to accept a position two levels below her previous position.

168.    Plaintiff suffered retaliation when Defendant moved her desk to face two walls.

169.    Plaintiff suffered retaliation when on November 29, 2016 she was taunted by her replacement, the Senior Director of Support, who was acting on behalf of the Company when he incorrectly told her the data, she reported to the Board was "flawed."

170.    Plaintiff suffered retaliation when on June 22, 2017 she was terminated under the guise of a restructuring with the Chief Financial Officer in attendance, an atypical observer for a low-level employee termination.

171.    As a direct, legal and proximate result of Defendants' reprisals, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages of at least $300,000 but in an amount to be proven at trial.

172.    Plaintiff is entitled to reasonable attorneys' fees and costs of suit as allowed by law.

173.    By the aforesaid acts and omissions of Defendants, Plaintiff has been directly and legally caused to suffer the harm and damages alleged.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for entry of judgment in her favor and against Defendants as follows:

A.     Compensatory damages, including without limitation, back pay, front pay, damages for loss of reputation, loss of opportunity for professional growth, additional financial incidental and consequential damages;

B.     Non-economic damages for emotional distress, pain and suffering, humiliation, inconvenience, mental anguish, loss of reputation, and other non-pecuniary losses;

C.     Liquidated, exemplary, and punitive damages as permitted;

D.     Reasonable attorneys' fees and costs as provided by statute or applicable law;

E.     Pre- and post-judgment interest; and

F.     Such other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

Dated:  February 23, 2018                     Respectfully submitted,


                                              By:   */s/ Victoria T. Aguilar*
                                              VICTORIA T. AGUILAR #34552
                                              THE AR GROUP, LLC
                                              8400 E Crescent Parkway, 6th Floor
                                              Greenwood Village, Colorado 80111
                                              720-452-3301
                                              victoria@theARgroup.com
                                              **ATTORNEY FOR PLAINTIFF**
                                              **JOANN AMOROSO**



**Plaintiff's Address:**

**7743 E. Kettle Court**

**Centennial, CO 80112**